UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA
:
- v. -
:  15 Cr. 109 (NRB)
JOSE TORO NARANJO,          18 Cr. 754 (NRB)
:
Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

                          GEOFFREY S. BERMAN
                          United States Attorney
                          Southern District of New York
                          Attorney for the United States of America

Negar Tekeei
Matthew J. Laroche
Assistant United States Attorneys

    - Of Counsel -

The Government respectfully submits this memorandum in connection with the sentencing of defendant Jose Toro Naranjo ("Naranjo" or "the defendant"), which is scheduled for Wednesday, April 17 at 2:30 p.m. For the reasons set forth below, the Government submits that a Guidelines sentence of imprisonment would be appropriate in this case.

## BACKGROUND

### A. Offense Conduct in *United States v. Jose Toro Naranjo*, 15 Cr. 109 (NRB)

The defendant and his co-conspirator, Rafael de Jesus Ricaurte-Gomez, were charged with participating in a cocaine-importation conspiracy relating to their agreement to transport 1,000 kilograms of cocaine into the United States in or about February 2015. The defendants were identified as part of a DEA investigation based in New York and Mexico City that began in the fall of 2014. (PSR ¶ 17).

In the fall of 2014 and early 2015, at the direction of the DEA, a DEA confidential source ("CS-1") contacted Toro Naranjo and discussed a transaction in which Toro Naranjo would supply a significant quantity of cocaine to individuals in Mexico. During those conversations, which were recorded, Toro Naranjo represented to CS-1 that he (Toro Naranjo) had access to multi-ton quantities of cocaine and that he was able to transport the cocaine from Colombia to Mexico. (PSR ¶ 17).

As a result of those discussions, a meeting was arranged on February 4, 2015 in Cartagena, Colombia, involving three DEA confidential sources ("CS-2", "CS-3" and "CS-4") and Toro Naranjo (the "First Meeting"). (PSR ¶ 18). However, Ricaurte-Gomez was asked by Toro Naranjo to appear at the First Meeting on Toro Naranjo's behalf because Toro Naranjo was late. (PSR ¶ 18). The First Meeting was audio recorded and was surveilled and photographed by members of the Colombian Sensitive Investigation Unit. (PSR ¶ 18). During the First Meeting,

Ricaurte-Gomez told the CS's 2, 3, and 4 that Toro Naranjo could send 1,000 kilograms of cocaine to Vera Cruz, Mexico via container ship. (PSR ¶ 18). CS-2 told Ricaurte-Gomez that CS-2 could transport the 1,000 kilograms of cocaine from Vera Cruz, Mexico to New York. (PSR ¶ 18). Ricaurte-Gomez agreed to meet again with CS's 2, 3, and 4, along with Toro Naranjo. (PSR ¶ 18).

Later that day, another meeting took place in Cartagena (the "Second Meeting") involving CS's 2, 3 and 4, and Ricaurte-Gomez and Toro Naranjo. (PSR ¶ 19). The Second Meeting was also audio recorded and was surveilled and photographed by members of the Colombian Sensitive Investigation Unit. (PSR ¶ 19). During the Second Meeting, the parties again discussed the plan to ship 1,000 kilograms of cocaine from Colombia to CS-2 in Vera Cruz, which CS-2 would then transport to New York via tractor trailer. (PSR ¶ 19). The parties also agreed that 500 kilograms would belong to Toro Naranjo and that CS-2 would purchase 500 kilograms from Toro Naranjo at $3,500 per kilogram. (PSR ¶ 19). Furthermore, CS-2 agreed to pay for CS-2's 500 kilograms before they were sent from Colombia to Vera Cruz. (PSR ¶ 19). It was further agreed that CS-2 would be responsible for transporting all 1,000 kilograms from Vera Cruz to New York via truck and that CS-2 would give Toro Naranjo the profits from the 500 kilograms belonging to Toro Naranjo. (PSR ¶ 19).

At the conclusion of the Second Meeting, and through follow-up electronic communications between Toro Naranjo and CS-1, the parties agreed that CS's 2, 3, and 4 would meet Toro Naranjo in Cartagena on or about March 4, 2015 to pay for their 500 kilograms of cocaine and that, also on or about that date, the full 1,000 kilograms would be shipped from Colombia to Vera Cruz, Mexico. (PSR ¶ 20). On or about March 4, 2015, Toro Naranjo and

2

Ricaurte-Gomez were arrested on the charges in the Indictment as they were waiting in a restaurant in Cartagena to receive the payment from CS's 2, 3, and 4.  (PSR ¶ 21).

On February 26, 2015, a federal grand jury, sitting in the Southern District of New York, approved and filed Indictment 15 Cr. 109 (NRB) charging the defendant with conspiracy to: (i) manufacture and distribute a controlled substance (five kilograms or more of cocaine) intending and knowing that it would be imported into the United States, and (ii) import a controlled substance (five kilograms or more of cocaine) into the United States from a place outside thereof, in violation of Title 21, United States Code, Sections 952(a), 959(a) and (c), 960 (a)(1) and (b)(1)(B), and 963 (the "SDNY Case").  On December 13, 2017, the defendant pled guilty, pursuant to a plea agreement, to the charge in the SDNY Case.

**B. Offense Conduct in *United States v. Jose Toro Naranjo*, 18 Cr. 754 (NRB)**

The defendant and his co-conspirators were charged with participating in a conspiracy to (a) distribute cocaine on board an aircraft registered in the United States, beginning in and around May 2013 and continuing through in or around May 2014, and (b) participating in a money-laundering conspiracy beginning in and around May 2013 and continuing through in or around May 2014.  The defendant and his co-conspirators were identified as part of a DEA investigation based in Florida and South America that began in approximately 2013.  (PSR ¶ 24).

The defendant conspired with Jose Virgilio Garzon Varon, a/k/a "El Gordo," ("Garzon"), Camilo Enrique McAllister Maldonado ("McAllister"), and Jaime Augusto Pinto Ferreira ("Pinto") to transport 2,500 kilograms of cocaine from South America to Central America onboard a private jet registered to the United States.  (PSR ¶ 25).

3

The defendant's role included attempting to finance the transportation of the plane and the cocaine. (PSR ¶ 26). In connection with his role, the defendant engaged in a series of monetary transfers to one of his co-conspirators, which funds were then transferred via wire transactions to bank accounts in Florida. (PSR ¶ 26).

The DEA's investigation was aided by the use of a confidential source ("CS-5"). Between approximately December 2013 and May 2014, CS-5 maintained contact with the defendant, Pinto, and others regarding the attempt to coordinate the cocaine load aboard the aircraft. Toro-Naranjo directed several wires and/or cash deposits to fund the trip to Ecuador. (PSR ¶ 28). However, the conspirators were unable to produce all of the promised funds to finance the operation. Eventually, the conspirators gave up on coordinating a trip with CS-5. (PSR ¶ 28).

Between approximately January 19 and January 25, 2014, CS-5 met in Colombia with the defendant, Pinto, and others about coordinating a cocaine load from South America to Central America. (PSR ¶ 29). During these conversations, the defendant, Pinto, and others discussed possible amounts of cocaine. (PSR ¶ 29).

From approximately December 2013 through April 2014, the defendant communicated directly with CS-5 through PIN messages. (PSR ¶ 30). Through communications with Pinto, CS-5 was able to confirm that the person with whom he believed was the defendant was in fact the defendant and later identified as the defendant. (PSR ¶ 30). Also, through a series of PIN messages between the defendant and CS-5, the defendant admitted his involvement in financing the aircraft and directed approximately $115,000 to CS-5 for expenses related to transporting the cocaine from South America to Central America. (PSR ¶ 30). The following are relevant PIN messages between the defendant and CS-5:

4

- 12/3/2013 The Defendant to CS-5: "You can see that we can organize things because you know beforehand that you can count on people since that's what I consider myself people before being the boss."

- 12/5/2013 The Defendant to CS-5: "Buddy I'm not the one to judge since things didn't come through and the only thing I got to know because I wasn't there was that you didn't want to talk with the people that you were only taking with Gordo [GARZON]."

- 12/5/2013 The Defendant to CS-5: "But apart from that the truth is that the one that suffered the most is me because I'm the one who had to pay all the expenses."

- 12/5/2013 The Defendant to CS-5: "The thing of Cartagena was handled by the owner of the things and Gordo [Garzon] there who were the ones that were there."

- 12/9/2013 The Defendant to CS-5: "Then I'd send you the 53 plus the eight." "And what else for you to go up to Ecu."

- 12/13/2013 The Defendant to CS-5: "Buddy would you be so kind for an account from there for them to deposit 85000 for you."

- 12/24, 12/27, 12/30 and 12/31/2012, the DEA received a series of cash deposits into a DEA undercover bank account – which correlated to the $85,000 referenced in the PIN of December 13, 2013. Ultimately the defendant sent a little less than $85,000 and the lesser amount is reflected in the PINs.

- 2/5/2014 The Defendant to CS-5: "Let me tell you that here I have 30000 to send you."

- 2/6/2014 The Defendant to CS-5: "Have you confirmed the deposit already."

(PSR ¶ 30).

On May 6, 2014, the CS received a call from an individual ("Individual-1") claiming that Individual-1 was sent on behalf of the defendant to handle the transfer of the aircraft. (PSR ¶ 31). The defendant and his co-conspirators were ultimately unable to gather the necessary funds or successfully coordinate loading the plane and transporting it to Central America. (PSR ¶ 32).

On June 30, 2015, a federal grand jury, sitting in the Southern District of Florida, approved and filed Indictment 15 Cr. 20502 (JAL) charging the defendant with the following offenses: (1) conspiracy to distribute cocaine on board an aircraft registered in the United States, beginning in and around May 2013 and continuing through in or around May 2014, in violation of Title 21, United States Code, Sections 959(b)(1),[1] 960(b)(1)(B), and 963 (Count One); and (2) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h) (Count Two) (the "SDFL Case").  On October 16, 2018, the SDFL Case was transferred to the Southern District of New York.  On January 3, 2019, the defendant pled guilty to Counts One and Two of the SDFL Case, which is now docketed as 18 Cr. 754 (NRB).

### C. The Defendant's Adjusted Offense Level and Criminal History

The defendant's adjusted offense level and criminal history calculations are detailed in the PSR and the parties' Plea Agreements.  The Guidelines Manual in effect as of November 1, 2018 applies to the offense conduct.  (PSR ¶ 37).  Pursuant to U.S.S.G. § 3D1.2(d), because the offense levels for Count One of the SDNY Case and Count One of the SDFL Case are determined largely on the basis of the quantity of a substance involved, the counts are grouped together into a single group.  (PSR ¶ 38).  Pursuant to U.S.S.G. § 3D1.2(d), Counts One and Two of the SDFL Case are grouped together because they involve two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.  (PSR ¶ 39).  Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group

---

[1] On the date of the SDFL Indictment, July 1, 2015, Title 21, United States Code, Section 959(b)(1) stated as follows:  "It shall be unlawful for any United States citizen on board any aircraft, or any person on board an aircraft owned by a United States citizen or registered in the United states, to (1) manufacture or distribute a controlled substance or listed chemical[.]"  This provision is currently set forth in Title 21, United States Code, Section 959(c)(1).

is the offense level for Count One of the SDNY Case and Count One of the SDFL Case, which are the most serious of the counts comprising the Group and the highest offense level of the Counts in the Group. (PSR ¶ 39). Pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), because the offense involved more than 450 kilograms of cocaine, the base offense level is 38. (PSR ¶ 40). Pursuant to U.S.S.G. § 2D1.1(b)(18), because the defendant appears to meet the criteria set forth in U.S.S.G. § 5C1.2(a)(1)-(5), the offense level is decreased by two. (PSR ¶ 41). Pursuant to U.S.S.G. §§ 3E1.1(a) and (b), a three-level decrease is warranted for the defendant's demonstration of acceptance of responsibility. (PSR ¶¶ 47, 48). Thus, the defendant's total adjusted offense level is 33. (PSR ¶ 48).

The defendant is in Criminal History Category I.[2] (PSR ¶ ). With an adjusted offense level of 33 and a Criminal History Category of I, the defendant's Guidelines range of imprisonment is 135 to 168 months' imprisonment. (PSR ¶ 90).

## DISCUSSION

In light of the nature and circumstances of the instant offenses, the Government respectfully submits that a sentence within the Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing. The 18 U.S.C. § 3553(a) factors applicable in this case include the need for the sentence imposed to reflect the seriousness of the offense, to afford adequate deterrence to this defendant and other similarly situated individuals, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)-(B).

---

[2] Because the defendant first pled guilty to the charges in the SDNY Case, the parties' Plea Agreement for the SDFL Case calculated that the defendant had one criminal history point, pursuant to pursuant to U.S.S.G. §§ 4A1.2(a)(4) and 4A1.1(c), and that the defendant's Criminal History Category is I. The PSR calculates that the defendant has zero criminal history points, which also places the defendant in Criminal History Category I. (PSR ¶ 52).

The Probation Department recommends a significantly below-Guidelines sentence of 65 months' imprisonment.  (PSR at 23).  In doing so, the Probation Department points to the sentences of the defendant's co-defendants – in the SDNY Case, Rafael Ricaurte-Gomez (who was sentenced to approximately 36 months' imprisonment), and, in the SDFL Case, Jaime Augusto Pinto Ferreira (who was sentenced to approximately 57 months' imprisonment).  (*Id.*).  The defendant seeks a sentence of time served.  (Def. Mem. at 7).  As the defendant has been in custody since March 4, 2015, and a sentence of time served would be approximately 49 months' imprisonment.  (*See* PSR at 2).  The Government respectfully disagrees with the Probation Department's assessment and submits, as set forth below, that a Guidelines range sentence is appropriate in this case, where the defendant – unlike his previously-sentenced co-defendants Ricaurte-Gomez and Pinto Ferreira – committed serious narcotics and money laundering offenses in two separate schemes over the course of almost two years.

A Guidelines sentence would be appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), and to provide adequate deterrence, 18 U.S.C. § 3553(a)(2)(B).  Simply put, the defendant engaged in two criminal schemes designed to transport and distribute thousands of kilograms of cocaine, including into the United States, and engaged in illegal money transfers to effectuate the first of those schemes.

The defendant played key roles in both schemes.

First, and in chronological order, the defendant conspired to distribute thousands of kilograms of cocaine on board an aircraft registered in the United States, and laundered money in connection with that scheme into the United States, from approximately May 2013 through May 2014.  In connection with his role as a financier of the airplane transportation, the defendant (a)

8

engaged in a series of money transfers, including to bank accounts in Florida, and (b) engaged in extensive communications with a confidential source about the conspirators' efforts to coordinate the shipment. The plan failed only because the defendant and his co-conspirators were unable to gather the funds to finance loading and transporting the plane with cocaine.

Second, after participating in a conspiracy to load a plane to transport cocaine, the defendant participated in a different scheme to load container ships with 1,000 kilograms of cocaine. The defendant told a confidential source (CS-1) that he had access to multi-ton quantities of cocaine that he could transport from Colombia to Mexico, and then conspired with Ricaurte-Gomez to do so. During a meeting with a confidential source, the defendant agreed that 500 kilograms of cocaine would belong to *him* and that the confidential source would purchase 500 kilograms of cocaine from the defendant. The defendant's argument that his participation in the scheme can be equated to that of his co-defendant, Ricaurte-Gomez, is undermined by the defendant's own actions during the course of the conspiracy. The defendant, and not Ricaurte-Gomez, was the point of contact with the CS-es, and the defendant – and not Ricaurte-Gomez – was principally responsible for negotiating the transactions.

The Government recognizes the defendant's arguments for mitigating circumstances including that he (a) was unsuccessful in both of his schemes to distribute thousands of kilograms of cocaine, (b) spent some period of his incarceration at La Picota prison in Colombia, and (c) has a positive record while incarcerated. However, these factors do not warrant the significantly below-Guidelines sentence that the defendant seeks.

The defendant's participation in the two schemes, during which he planned to illegally distribute thousands of kilograms of cocaine over an approximately two-year period, constitutes extremely serious and dangerous conduct over an extended time period. At a time when

narcotic addiction plagues communities across the United States and around the world, the defendant chose to perpetuate addiction for his own potential profit. A Guidelines sentence is necessary to afford adequate deterrence to criminal conduct, protect the public from his further crimes, as well as to reflect the seriousness of the offense and provide just punishment. *See* 18 U.S.C. § 3553(a)(1), (2)(A), (B) and (C).

## CONCLUSION

For the foregoing reasons, the Government submits that a Guidelines sentence is appropriate in this case.

Dated: April 11, 2019
       New York, New York

                          Respectfully submitted,

                          GEOFFREY S. BERMAN
                          United States Attorney

By:    /s/ Negar Tekeei
       Negar Tekeei / Matthew J. Laroche
       Assistant United States Attorneys
       (212) 637-2482 / 2420